Dick G. **RICHARDS** and Capitol Bank of Commerce, Plaintiffs,

v.

**NIELSEN FREIGHT LINES**, Di Salvo Trucking Company, Delta Lines, Inc., Peters Truck Lines, Local No. 150, Chauffeurs, Teamsters and Helpers, Defendants.

No. Civ. S–81–838 LKK.

United States District Court, E.D. California.

Feb. 15, 1985.

James Duryea, Jr., David Russo, William Taylor, Handler, Baker, Greene & Taylor, San Francisco, Cal., for plaintiffs.

William G. Van Der Mei, Law Corp., Sacramento, Cal., for Peters Truck Lines.

Beeson, Tayer & Bodine, Sacramento, Cal., for Local 150.

McCutchen, Doyle, Brown & Enerson, Charles Ferguson, San Francisco, Cal., for Delta Lines.

Michael J. Stecher, Silver, Rosen, Fischer & Stecher, San Francisco, Cal., for Di Salvo Trucking.

Robert Weir, San Jose, Cal., for Nielsen Freight.

## ORDER

KARLTON, Chief Judge.

Plaintiff Foothills Express, Inc.,[1] a non-union trucking company, filed this action against Nielsen Freight Lines, Inc. ("Nielsen"), Di Salvo Trucking Co. ("Di Salvo"), Delta Lines, Inc. ("Delta"), and Peters Truck Lines ("Peters"), all trucking companies, and Local 150 of the Teamsters Union ("the Union").[2] Plaintiff seeks treble damages alleging that pursuant to an agreement in violation of the antitrust laws, the trucking company defendants, who are at once direct competitors of the plaintiff and purchasers of plaintiff's "interlining services," engaged in a concerted refusal to deal, i.e. "group boycott" of plaintiff.

All parties in this action have filed cross-motions for summary judgment or partial summary judgment. Those motions are disposed of in this Memorandum and Order.

### I

### JURISDICTION

This court exercises subject matter jurisdiction over the antitrust claim pursuant to 15 U.S.C. § 4 (Sherman Act), 28 U.S.C. §§ 1331 (West Supp.1984) (federal question) and 1337(a) (interstate commerce). *See California Dump Truck Owners Ass'n, Inc. v. Associated General Contractors,* 562 F.2d 607, 609 & n. 1 (9th Cir. 1977). Subject matter jurisdiction over the state claims is predicated upon pendent jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

### II

### THE COMPLAINT

A. *The Parties*

At all times relevant to this lawsuit, the plaintiff was a non-union trucking company

1. On March 21, 1983, Dick G. RICHARDS, as Trustee for the Estate of Foothills Express, Inc., and Capitol Bank of Commerce, assignee of Foothills Express, were substituted in as plaintiffs in the action.

2. "Local 150, Chauffeurs, Teamsters, and Helpers."

located and operating within this judicial district.[3] The defendants are four unionized trucking companies and the Union, a local labor organization which represents the employees of the trucking company defendants. The trucking company parties at all relevant times were engaged in the business of transporting goods, commodities, and other property interstate and within California.

### B. *The Charging Allegations*

The complaint charges violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, in that the defendants entered into three conspiracies in unreasonable restraint of trade in two markets.[4]

#### 1. *The First Conspiracy* (Complaint ¶ 13)

Trucking company defendants Nielsen and Di Salvo allegedly entered into a conspiracy to engage in a concerted refusal to deal with the plaintiff.[5] This conspiracy was carried out by the termination of all "interlining" relationships the conspirators had with the plaintiff. The purpose of this conspiracy was to restrain trade and monopolize the interlining market.

#### 2. *The Second Conspiracy* (Complaint ¶ 14)

All the trucking company defendants are alleged to have engaged in a conspiracy identical to that described above. In this second conspiracy, however, they are alleged to have acted "in concert" with the Union. The alleged purpose of this conspiracy also was to restrain trade and monopolize the interlining market.

#### 3. *The Third Conspiracy* (Complaint ¶ 15)

The third and final conspiracy allegedly originated with the Union. The Union is accused of having induced or enlisted all the trucking company defendants into joining a conspiracy essentially identical to those described above. According to the complaint, the purpose of this conspiracy was to eliminate competition in the interlining market, to eliminate plaintiff, a non-union carrier, from the market, and to restrain trade in the market.

## III

## THE UNDISPUTED FACTS

### A. *The Trucking Companies*

At all times relevant to this action, the trucking company parties were regularly engaged in the transportation of goods, commodities, and other property between points in California, as well as interstate transport. Each of them were "less than truckload" general freight carriers, which means that they (as "originating carriers") picked up freight from several customers (the "shippers") for delivery to a centrally-located terminal. At the terminal, the goods were consolidated and/or redistributed for ultimate delivery to multiple receivers (the "consignees").

Each trucking company in this action had the necessary legal authority to carry freight into the foothills region of Northern California. Nonetheless, each of the defendant trucking defendants elected not to carry their freight to the foothills themselves. Instead, they delivered their freight as far as Sacramento, and subcontracted with Foothills Express to complete the delivery into the foothills. This arrangement is called "interlining." Foothills, which made the final delivery into the foothills (the "interliner"), is said to have

---

**3.** That is to say, the drivers who worked for Foothills Express were not organized into any recognized union.

**4.** Plaintiff describes the relevant markets as follows:

One relevant market is the carriage of goods, commodities and other property through interline motor transportation into the foothills regions of Northern California. Another rele-

vant market is the sale of transportation services for direct delivery by a motor common carrier in Northern California. (Complaint ¶ 11).

**5.** The complaint alleges that Delta was one of the conspirators. However, the plaintiff has now abandoned this conspiracy claim against Delta. (*See* Plaintiff's Opp. to Delta's Motion, July 21, 1983).

sold "interlining services" to the defendant trucking companies.[6]

Each of the trucking company defendants' employees were members of the defendant Union. The plaintiff's employees were not members of any recognized union. When the defendant trucking companies interlined with Foothills, therefore, the defendant trucking companies' union member employees turned over freight to non-union members for final deliveries which the companies were authorized to make themselves with their own unionized drivers.

### B. "Back Solicitation"

The practice of interlining is apparently a delicate business, as it may involve direct competitors contracting with each other to split up particular shipments and the costs and revenues therefor. By interlining for a competitor, the interliner necessarily gained easy and direct access to all the information contained in the competitor's freight bill. This information included who the competition's customers were, as well as the particular charges, and types of freights carried by the competitor. How much of this information was generally available throughout the industry is disputed.

An interlining trucking company which used the information gleaned from the competition's bill of lading to solicit the business of the originating carrier's customers, was said to have "back solicited" the originating carrier's customers. All the parties appear to agree with the definition of "back solicitation" offered by the President of defendant Nielsen Trucking Company, Norman Nielsen (on deposition):

"Back solicitation" to me means that any shipments that we should interline to another carrier for subsequent delivery, that information on that freight bill is then used by the delivery carrier for the purpose of going directly to the shipper and soliciting that merchandise direct and eliminating the pickup [originating] carrier.... [To "go direct" is to] go to that shipper and ask the shipper to turn that shipment not to [the originating carrier] and interline it to Foothills at another location, but to allow Foothills to handle that shipment on a direct basis from point of origin to point of destination, and by doing that, eliminating [the originating carrier].

Dep. of Norman Nielsen at 22.[7]

### IV

### THE MOTIONS BEFORE THE COURT

Seven cross-motions for summary judgment are currently before the court. Plaintiff moves for summary judgment on the issue of liability for the alleged "back solicitation conspiracy" among Nielsen, Di Salvo, and Peters.[8] According to plaintiff, the undisputed admissions of three of the

---

**6.** All parties appear to agree with plaintiff's description of "interlining":

From an operational standpoint, there are instances where a carrier is engaged to pick-up and deliver freight and the actual delivery is accomplished (i) by that carrier alone, (ii) by that carrier together with another or other carriers, or (iii) entirely by another carrier or carriers. The process by which freight is delivered in concert with other carriers is identified in California as sub-hauling, i.e., lease of equipment from one company to another, or interlining, viz., freight tendered by one carrier to another for ultimate delivery by a second carrier (which may also involve the lease of equipment). (Dep. of N. Nielsen, 1/21/82, pp. 20–23). In the interline arrangement, a motor carrier may voluntarily elect not to accomplish the entire delivery from point of origin to point of destination, even though the carrier has authority to do so. (Dep. of W.

Peters. pp. 29–32, 174; Dep. of C. Lawlor, pp. 18–19). The carriers who participate in the delivery of freight divide the revenues derived therefrom. In the interline situation, Carrier A will deliver freight to Carrier B at a common interchange point whereupon Carrier B receives the freight and delivers the same to the ultimate consignee.

(Plaintiff's Motion at 8, June 20, 1983).

**7.** The relevant portion of Nielsen's deposition is an Exhibit to the Declaration of James Duryea, Jr., June 20, 1983.

**8.** Plaintiffs have developed evidence which, it claims, implicates Peters in the back solicitation conspiracy. The complaint, however, does not allege that Peters was involved in this conspiracy, nor have plaintiffs moved to so amend the complaint. (*See* n. 9, *infra*).

trucking company defendants establishes the existence of a conspiracy among them to enforce an industrywide rule prohibiting back solicitation. It claims that enforcement of this rule was accomplished through a group boycott which, it asserts, is a "per se" violation of the antitrust laws, thus entitling it to judgment as a matter of law.

Each of the trucking company defendants and the Union have moved for summary judgment as well. The trucking companies claim that no evidence exists of a conspiracy to boycott or to refuse to deal with Foothills, and that undisputed evidence of sound business justifications for their actions effectively rebuts any inference which might be drawn from apparently "parallel" conduct among them.[9] The Union claims that whatever actions it took were immune from antitrust liability under the labor exemptions to the antitrust laws, and therefore the plaintiff fails to state a claim against the Union as a matter of law. The trucking companies also invoke the labor exemption to immunize any boycott agreement they may have reached with the Union.

The remaining motions are discussed and disposed of at section IX, *infra*.

## V

### SUMMARY JUDGMENT STANDARDS

■ Summary judgment is appropriate only when it is demonstrated that there exists no genuine issue as to any material fact and, viewing the evidence in the light most favorable to the party opposing the motion, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c);[10] *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct.

486, 488, 7 L.Ed.2d 458 (1962); *Retail Clerks Union Local 648 v. Hub Pharmacy*, 707 F.2d 1030, 1033 (9th Cir.1983). The initial and ultimate burden of proof is upon the moving party. *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 901–02 (9th Cir.1983).

■ If the moving party meets its initial burden, the burden of production shifts to the party opposing the motion to establish the existence of a genuine dispute as to a material fact. *British Airways Board v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). To meet its burden, the opposing party "must present some 'significant probative evidence tending to support the complaint.'" *General Business Systems v. North American Philips Corp.*, 699 F.2d 965, 971 (9th Cir. 1983) (*quoting Poller*, 368 U.S. at 473, 82 S.Ct. at 491).

■ In this case, the key material fact potentially in dispute is the existence, vel non, of a conspiracy between or among some or all of the defendants. Therefore, on each defendant's motion for summary judgment, that defendant bears the initial burden of rebutting, by way of admissible evidence, plaintiff's allegations of conspiracy. *See Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 884 (9th Cir.1982) (*quoting ALW, Inc. v. United Air Lines, Inc.*, 510 F.2d 52, 55 (9th Cir.1975)), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). This may be done by proffering "'probative evidence supporting an alternative interpretation,'" other than conspiracy, for the defendant's conduct. *Id.*

Once the moving defendant has met its initial burden, the burden of production

---

9. Peters also points out that the complaint fails even to allege its participation in the "back solicitation conspiracy." This does not necessarily warrant summary judgment for Peters, however. *See Castner v. First National Bank*, 278 F.2d 376, 384–85 (9th Cir.1960) (permitting amendment). *Cf. Brandon v. Holt*, —— U.S. ——, 105 S.Ct. 873, 877, 878 n. 19, 83 L.Ed.2d 878 (1985).

10. The rule provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

shifts to the plaintiff. Fed.R.Civ.P. 56(e); *First Nat'l Bank v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); *British Airways Bd.,* 585 F.2d at 951. It must present " 'specific factual support of its allegations of conspiracy,' " or summary judgment for the moving defendant will be granted. *Zoslaw,* 693 F.2d at 884.

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *Poller,* 368 U.S. at 467, 82 S.Ct. at 488; *Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1305–1306 (9th Cir.1982). All reasonable inferences which may be drawn from the facts placed before the court must be drawn in favor of the party opposing the motion. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1250 (9th Cir.1982), *cert. denied,* 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983). If there is significant probative evidence in the record in support of both parties' contentions, summary judgment will not be proper for either. *Cf. First National Bank,* 391 U.S. at 285, 88 S.Ct. at 1590.

Although the standards noted above apply in antitrust cases, the court must keep in mind that a typically crucial element of the case—motive or intent—is not readily susceptible to resolution on a motion for summary judgment. *Mutual Fund Investors v. Putnam Management Co.,* 553 F.2d 620, 624 (9th Cir.1977). Notwithstanding this admonition, the motion will be granted if no evidence or reasonable inference from the evidence supports the plaintiff's claim or its allegations of motive and intent. *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 739 F.2d 1434, 1436 (9th Cir.1984). As Di Salvo points out in its excellent brief, "mere allegations or denials" of the complaint, "unsubstantiated hope," and "threadbare conclusory statements" are all insufficient to give rise to any inference of conspiracy once the moving defendant has met its initial burden. *See* Fed.R.Civ.P. 56(e); *First National Bank,* 391 U.S. at 289–90, 88 S.Ct. at 1592–93; *Chapman v. Rudd Paint & Varnish Co.,* 409 F.2d 635, 643 (9th Cir.1969); *Mutual Fund Investors,* 553 F.2d at 625. The plaintiff's burden can be met only with "significant probative evidence" of conspiracy. *Mutual Fund Investors,* 553 F.2d at 625.

## VI

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff seeks summary judgment against two of the trucking company defendants (Nielsen Freight Lines and Di Salvo Trucking Company)[11] on the issue of liability for the first alleged conspiracy, "back solicitation." (Complaint ¶ 13).[12] The plaintiff contends that there was an industry wide agreement not to back solicit the originating trucking companys' customers. When the plaintiff violated this agreement, it is asserted, the defendants enforced their agreement, and refused to deal

---

**11.** Plaintiff's motion seeks summary judgment against Peters as well. The complaint, however, does not charge Peters with participation in this conspiracy, nor has plaintiff moved to amend the complaint. The motion as against Peters is therefore DENIED.

**12.** The Complaint reads:
Beginning sometime prior to April 1, 1981, ... defendants Nielsen, Di Salvo, and Delta have entered into contracts, combinations and conspiracies to unreasonably restrain and to monopolize trade and commerce in the relevant markets ... [through]

i. entry into and enforcement of an agreement whereby Di Salvo, Delta and Nielsen terminated their ongoing interline relationships with plaintiff and thereafter refused to contract with, or retain, plaintiff for plaintiff's sale and performance of interline motor transportation services;
ii. said defendants, or some of them, refused to accept interline shipments originated by plaintiff and refuse to sell interline services to plaintiff ....
Complaint ¶ 13.

with it any further, by refusing to enter into any interlining relationships with the plaintiff.

■ Relying exclusively on the "per se" theory of antitrust liability,[13] the plaintiff asserts that there are two material facts which it must prove: (1) that there was an agreement "by and among" the defendants; and (2) that the agreement was "plainly anticompetitive" by its nature and effect. The plaintiff contends that there is no genuine dispute as to the existence of an anticompetitive combination and conspiracy "by and among" the trucking company defendants or its anticompetitive nature.

■ Plaintiff is correct that an essential element of an antitrust conspiracy case alleging a concerted refusal to deal is the existence of an agreement among competitors not to deal. "A claim of concerted refusal to deal obviously cannot stand without evidence of concert.... An individual [defendant] acting alone has the right to deal with whomever he pleases." *Rickards v. Canine Eye Registration Foundation, Inc.*, 704 F.2d 1449, 1454 (9th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983). As I explain below, the plaintiff has failed to meet its initial burden of establishing any such agreement

among the defendants and therefore its motion for summary judgment is DENIED.[14]

### A. *The Facts* [15]

The chief executive officers of each of the three defendant trucking companies testified (in deposition) that their companies did not engage in the practice of back solicitation. Peters Truck Lines has a company policy not to back solicit anyone purchasing its interlining services. This policy goes back forty (40) years. (Dep. of Walter F. Peters at 49 (April 28, 1982)).[16]

■ Di Salvo similarly has a company policy not to back solicit the customers of any trucking company which is purchasing its interlining services. According to the President of Di Salvo, this is only good business sense:

it's an absolute no-no in our industry; when you're dealing with another carrier, you don't try and bite the hand that's feeding you.... I think it's just an absolute obvious fact that if a customer [the originating carrier] is giving you [interlining] business and you try to torpedo that customer, you're eventually going to lose that business.

---

**13.** Certain restraints on trade, such as horizontal price-fixing, and output limitation, are considered to be so plainly anticompetitive, that they are considered to be illegal "per se." *See National Collegiate Athletic Association v. Board of Regents,* —— U.S. ——, 104 S.Ct. 2948, 2959–62, 82 L.Ed.2d 70 (1984). This rule is applied when " 'the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.' " *Id.* 104 S.Ct. at 2960 (*quoting Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979)). Concerted refusals to deal, or "group boycotts," are generally considered to be illegal under the "per se" rule. *See Pacific Stationery & Printing Co. v. Northwest Wholesale Stationers, Inc.,* 715 F.2d 1393, 1395–96 (9th Cir.1983), *cert. granted,* —— U.S. ——, 105 S.Ct. 77, 83 L.Ed.2d 26 (1984).

**14.** Plaintiff does not seek summary judgment on the basis of the *individual* "understanding" between purchasers and sellers of interlining services. Thus, even though Nielsen and Foothills, for example, are direct competitors, and may well have agreed to allocate customers, that is

not the basis of this summary judgment motion. This motion is predicated upon an agreement between Di Salvo and Nielsen not to back solicit, and to enforce the rule against plaintiff, not any agreements between Foothills and Di Salvo, Foothills and Peters, or Foothills and Nielsen, or any other purchaser/seller pair of trucking companies.

**15.** On the motion for summary judgment, the facts will be presented in the light most favorable to the opposing party. *See Deukmejian v. United States Postal Service,* 734 F.2d 460, 462 (9th Cir.1984) (per curiam). Any conflicting evidence is resolved in favor of the opposing party's evidence, and the opposing party will receive the benefit of every inference which reasonably may be drawn from the evidence. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam).

**16.** Walter F. Peters is the president of Peters Truck Lines and therefore competent to testify to these matters.

(Dep. of Lawlor at 25, 29 (March 16, 1982)).[17]

Nielsen, in its capacity as an interliner, has a policy not to back solicit Di Salvo's customers. (Dep. of Nielsen at 165 (January 21, 1982)).[18] Nielsen's president testified, however, that it has no such agreement with Peters or Delta, primarily because they do not compete in the same geographical or product areas. (Dep. of Nielsen at 165 and 166). On the other hand, there is competent evidence from which an agreement between Nielsen and Delta not to back solicit in the context of their interlining relationships could be inferred. (Dep. of Lawlor at 161–162). There is also competent evidence to the effect that such an agreement existed between Nielsen and Peters in the context of their interlining relationships. (Dep. of Peters at 58–59).

Finally, there is competent evidence in the record that the three trucking company defendants ceased all interlining business with Foothills Express as a direct result of back soliciting of their customers by Foothills. (Dep. of Peters at 29–30; Dep. of Nielsen at 14 (February 24, 1982); Dep. of Peters at 56).

Thus, there is evidence in the record indicating the existence of an "understanding" between the purchasers and sellers of interlining services, that the interliner will not back solicit the customers of the originating carrier. Moreover, there is evidence that each of the three trucking companies ceased dealing with plaintiff after plaintiff back solicited its customers.

### B. *Application of the Law to the Facts*

From this evidence, the plaintiff seeks summary judgment on the basis that "[t]he foregoing undisputed facts prove the existence of concerted action *by and among* defendants Di Salvo, Nielsen, and Peters...." Plaintiff misconceives the role of inferences on the summary judg-

ment motion. It may be true that the testimony just summarized could give rise to an inference of a single agreement among the three trucking company defendants that none of them would ever back solicit any of the others. That, however, is not the question before me. The question before me on *plaintiff's* motion for summary judgment is whether, viewed in the light most favorable to *defendant,* and drawing all reasonable inferences in *defendant's* favor, plaintiff has established the absence of a triable issue as to the existence of a conspiracy by and among the three trucking company defendants.

As defendants point out, an equally reasonable inference is that as purchasers and consumers of interlining services, the originating carrier and the interlining carrier agreed to certain conditions, namely, that no back soliciting would occur. The testimony of the officers of the trucking companies establishes only that as to each *individual* interlining relationship, an understanding existed that the interliner would not use the information gleaned from the freight bills of a particular shipment as a basis for soliciting the originating carrier's customers. The testimony does not establish that this was *one* agreement subscribed to by the entire trucking industry, or among those defendants, but only that it was an understanding based upon common sense business necessity which arose each time an interlining relationship was established. The existence of one, single, industry wide agreement to this effect, or among these defendants is pure inference which, while possible to draw, I may not draw in favor of the plaintiff on its summary judgment motion.

Instead, I draw the inferences in favor of the opposing parties, as I must under summary judgment practice. Viewing the evidence most favorably to the defendants, a reasonable inference therefrom is relatively

---

17. Charles Lawlor is the president of Di Salvo Trucking Company (Dep. of Lawlor at 5), and therefore competent to testify to these matters.

18. Norman Nielsen is the president of Nielsen Freight Lines, Inc., and therefore competent to testify to these matters.

simple (and innocent from an antitrust standpoint). Every trucking company which purchases interlining services does so for purely self-interested, economic motives. The plaintiff itself has stressed this point. The process of back soliciting, however, completely undermines the economic advantage in purchasing interlining services. It is a reasonable inference that no sensible originating trucking company would purchase interlining services from a company which used that very relationship to obtain the originator's customers.[19] The fact that every trucking company reacted similarly to such a practice demonstrates only that they are each sensible trucking companies, not that they have an agreement to behave in such a manner.

### C. Conclusion

Under the facts presented by the plaintiff, a reasonable person could draw one of at least two inferences: (1) the two defendant trucking companies conspired to refuse to deal with anyone who violated the unwritten agreement proscribing back soliciting; or (2) both of the defendant trucking companies independently reached the sensible conclusion that it would not continue to interline with a company which used the interlining relation to its detriment. Under one inference the defendants might be liable for an antitrust violation, but under the other, there is no basis for such liability. Since, therefore, it is not *clear* that plaintiff is entitled to judgment as a matter of law, its motion for summary judgment is DENIED.

### VII

### THE UNION'S MOTION FOR SUMMARY JUDGMENT: THE LABOR EXEMPTION

As noted, the Union is charged with participation in two conspiracies. In the first, the Union and the trucking companies allegedly conspired to restrain trade and monopolize the relevant markets by engaging in a concerted refusal to deal with the plaintiff. (Complaint ¶ 14). In the second, the Union allegedly originated a conspiracy to eliminate competition in the relevant markets, exclude plaintiff from the markets, and restrain trade in the trucking services market. The Union allegedly "enlisted" the trucking company defendants in this conspiracy. (Complaint ¶ 15). In both, the trucking company defendants allegedly engaged in a group boycott of the plaintiff by terminating all interlining relationships with it.

The Union asserts its conduct is protected activity under section 20 of the Clayton Act, and under the Norris-La Guardia Act, known collectively as the statutory labor exemption. The Union is entitled to summary judgment on its labor exemption defense only if, viewing the facts in the light most favorable to the plaintiff, that exemption applies. I begin by first reviewing the applicable law on the "labor exemption" in order to determine which facts are relevant to this consideration.

---

**19.** If this is not an obvious inference, an analogy (suggested by the evidence) should make it clearer. When an originator purchases interlining services from another trucking company, the originator is nonetheless held responsible (by the shipper) for the safe and timely delivery of the goods. If an originating carrier cut off all business with an interliner which continually lost or destroyed the goods committed to it, a reasonable inference could be drawn that its loss of business was due to a sensible, *independent* business judgment on the part of the originating carrier. The originator in this case would find that it was losing customers, since it was blamed for the interliner's misadventures. If the originator cut off *all* business as a result of just one mishap with just one customer, the same inference could still reasonably be drawn: a sensible trucking company would not necessarily wait until the interliner had caused it to lose each of its customers by successive mishaps.

In this analogous situation, if every originating carrier cut off business with the interliner after one or more such mishaps, a reasonable inference would be that each carrier exercised independent business judgment in seeking a more reliable interliner. Although an inference could be drawn that an unlawful industry-wide agreement existed among defendants to cut off any interliner who ever mishandled goods, that inference could not be drawn on the plaintiff's motion for summary judgment.

## A. *The Law*

In 1890, the Congress enacted sections 1 and 2 of the Sherman (Antitrust) Act. The Act condemned as unlawful "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1 (as amended) (West Supp.1984). It also provided for the punishment by fine and imprisonment of "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States...." 15 U.S.C. § 2 (as amended) (West Supp.1984). The subsequent conflicts which arose between this Act and Congress' desire to exempt certain labor activities from its reach is set out in several cases and need not be repeated in detail here. *See, e.g., Bodine Produce, Inc. v. United Farm Workers Organizing Committee,* 494 F.2d 541, 544–56 (9th Cir.1974). *See also, Allen Bradley Co. v. Local Union No. 3,* 325 U.S. 797, 801–06, 65 S.Ct. 1533, 1536–38, 89 L.Ed. 1939 (1945); *United States v. Hutcheson,* 312 U.S. 219, 229–31, 61 S.Ct. 463, 464–65, 85 L.Ed. 788 (1941); *Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Products, Inc.,* 311 U.S. 91, 100–03, 61 S.Ct. 122, 126–28, 85 L.Ed. 63 (1940). The following brief history should suffice for purposes of this case to impart an understanding of the relationship between the Sherman Act and the subsequent statutory labor exemptions.

Soon after its enactment, the federal courts construed the Sherman Act to limit the activities of labor organizations. In response to such constructions of the Sherman Act, and in an effort to secure labor peace, the Congress in 1914 enacted sections 6 and 20 of the Clayton Act, 15 U.S.C. §§ 17 and 29 U.S.C. § 52, to exempt labor organizations and certain of their activities from the reach of the Act. Section 6 provided as follows:

The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor ... organizations ... or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti-trust laws.

15 U.S.C. § 17. Section 20 provided that:
No restraining order or injunction shall be granted ... in any case between an employer and employees ... involving, or growing out of, a dispute concerning terms or conditions of employment ....

And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; ... or from ceasing to patronize ... any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; ... *nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States.*

29 U.S.C. § 52 (emphasis added). Despite the apparent plain meaning of the provisions and their clear legislative history, the Sherman Act's application to labor disputes was not laid to rest. Rather, the federal courts continued to apply the Sherman Act to labor disputes at least where they found that the disputants were not in a "proximate relation" to the dispute, and if they departed from the "normal and legitimate objects" of labor organizations. *See, e.g., Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921).

Finally, in 1932, Congress enacted the Norris-La Guardia Act in an effort to clarify labor's exemption from the Sherman Act. In that Act, Congress declared: "No court of the United States ... shall have jurisdiction to issue any restraining order ... in a case involving or growing out of a labor dispute...." 29 U.S.C. § 101.

■■ In its motion for summary judgment, the Union claims exemption from the Sherman Act on the basis of the boycott ("ceasing to patronize") language of the Clayton Act. In determining whether the Union's conduct is entitled to the exemption, I must examine the facts in light of those Acts and authoritative judicial constructions thereof. As the Supreme Court has stated, "[w]hether trade union conduct constitutes a violation of the Sherman Law is to be determined only by reading the Sherman Act and § 20 of the Clayton Act and the Norris-LaGuardia Act as a harmonizing text of outlawry of labor conduct." *Hutcheson*, 312 U.S. at 231, 61 S.Ct. at 466. If the conduct complained of falls within the language of the Clayton and Norris-La Guardia Acts, then the conduct is exempt from Sherman Act liability. *Id.*

### B. *Requirements for Invoking the Exemption*

■■ The plain language of the Clayton and Norris-La Guardia Acts reveal two (and only two) basic requirements which must be met in order to invoke the labor exemption, namely, a labor dispute and conduct falling within the ambit of section 20. I examine each in turn.[20]

#### 1. *Labor Dispute*

First, whether the exemption is claimed under the Clayton Act, the Norris-La Guardia Act, or both, the case must involve or grow out of a labor dispute. 29 U.S.C. §§ 52, 101. *Cf. H.A. Artists & Associates, Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 714 n. 14, 101 S.Ct. 2102, 2108 n. 14, 68 L.Ed.2d 558 (1981). It may fairly be said

that this requirement is the *sine qua non* of entitlement to the labor exemption. This fundamental requirement reflects the purpose and policy behind the exemption: "the courts must not use the antitrust laws as a vehicle to interfere in labor disputes." *H.A. Artists*, 451 U.S. at 714, 101 S.Ct. at 2108 (footnote omitted).

The only scope for judicial activity in relation to the requirement of a labor dispute might be found in construction of the various terms employed in the statute. Perhaps in an effort to ensure that its will not be frustrated, Congress undertook to define the pertinent terms itself. Thus a "labor dispute" is defined to include "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating ... terms or conditions of employment, *regardless of whether or not the disputants stand in the proximate relation of employer and employee.*" 29 U.S.C. § 113(c) (emphasis added). The statute provides that a case may be said to "involve or grow out of" a labor dispute if it involves "any conflicting or competing interests" in the dispute of " 'persons participating or interested' " in the dispute. 29 U.S.C. § 113(a).[21] Finally a person is "participating or interested" in a labor dispute "if relief is sought against him or it, and if he or it is engaged in the same industry ... or occupation in which such dispute occurs, or has a direct or indirect interest therein...." 29 U.S.C. § 113(b).

#### 2. *Conduct Within Section 20*

Since in this case, the Union claims exemption under section 20 of the Clayton Act, the conduct complained of must be described by that section. 29 U.S.C.

---

**20.** I pause briefly to note how infrequently cases purporting to construe the statutory exemption begin analysis by considering the text of the statute. While it may not be the ending point of statutory construction, " '[t]he starting point in every case involving construction of a statute is the statute itself.' " *Watt v. Alaska*, 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981) (*quoting Blue Chip Stamps v. Manor Drug*

*Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)).

**21.** Alternatively, a case involves or grows out of a labor dispute if it involves "persons who are engaged in the same industry ... or occupation ... whether such dispute is (1) between ... employers and ... employees [or unions]; (2) between ... employers; or (3) between ... employees [or unions] ...." 29 U.S.C. § 113(a).

§ 52;[22] *Hutcheson,* 312 U.S. at 232, 61 S.Ct. at 466. In particular, the Union claims exemption under the boycott language of the Clayton Act, which provides: "[nothing] shall prohibit any person or persons, whether singly or in concert, ... from ceasing to patronize ... any party to such dispute, or from ... persuading others by peaceful and lawful means so to do...." 29 U.S.C. § 52.

### 3. Unilateral Conduct

As noted, the statutory requirements are two. Another requirement for invocation of the labor exemption has been imposed by the courts, however. As the Ninth Circuit put it: "[The labor exemption] is not absolute; it is subject to exceptions." *California Dump Truck Owners Ass'n, Inc. v. Associated General Contractors,* 562 F.2d 607, 610 (9th Cir.1977). Accordingly, the final hurdle for the defendant invoking the labor exemption is to establish that it is not subject to any "exception" from the exemption.[23]

In *Allen Bradley Co. v. Local Union No. 3,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), the Supreme Court held that a union may not invoke the labor exemption if it "combined" with businesspersons in a conspiracy in restraint of a business market. In that case, electrical contractors and manufacturers based in New York City, and the local union representing their workers successfully conspired to monopolize the electrical equipment market by excluding all electrical equipment manufactured out of town. The union participated in this conspiracy in two ways. First, it threatened that its members would "terminate the 'relation of employment'" with, and "cease to perform 'work or labor'" for, noncooperative local employers who bought from anyone other than local manufacturers. *Id.* at 807, 65 S.Ct. at 1538 (quoting 29 U.S.C. § 52). Second, it persuaded the employers to boycott (apparently local) sellers of the boycotted equipment. *Id.* at 807, 65 S.Ct. at 1538.

The Court noted that the union was privileged to take these actions, and that they normally could not be held accountable under the Sherman Act for them. *Id.*[24] One might think that analysis as to union liability might have ended there; remarkably, in light of the statutory language and its legislative history, it did not.[25] Reasoning that, since the union's activities actually occurred not unilaterally and in furtherance of the union's own goals,[26] but as part

---

As best the court can tell, the Union does not claim this prong of the exemption.

**22.** "[N]or shall any of the acts *specified in this paragraph* be considered or held to be violations of any law of the United States." 29 U.S.C. § 52 (emphasis added).

**23.** No matter how hard I look I can find no provision in the statute for an exception to the exemption, and thus must leave to others a demonstration of its statutory origin. Indeed, since section 20 contemplates a union persuading others not to deal with an employer with which it is engaged in a labor dispute, the statutory basis of the exception (especially when the subject matter is a boycott) is obscure, to say the least. As I have explained before, however, as a subordinate court I am bound to apply the teachings of the courts by which I am bound, however misguided. *See Harris v. Tomczak,* 94 F.R.D. 687, 698 (E.D.Cal.1982) (*citing Hutto v. Davis,* 454 U.S. 370, 375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982) (per curiam)). I now turn to that task.

**24.** The union could threaten that its members would terminate their employment, or strike.

29 U.S.C. § 52; *Hunt v. Crumboch,* 325 U.S. 821, 824, 65 S.Ct. 1545, 1546, 89 L.Ed. 1954 (1945). Moreover, the union could persuade the employers to boycott recalcitrant local sellers who were parties to the labor dispute. *United States v. Hutcheson,* 312 U.S. 219, 233, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941).

**25.** An entirely different rationale from that adopted by the Court could explain the result in the case. Arguably the statutory exemption would not lie at all because, in fact, there was no labor dispute within the meaning of the Act. Such an analysis, based upon the statutory language, not only would be in accordance with ordinary methods of legal analysis, but might well lead to the same result. As I explain above, however, such was not the course the Court took.

**26.** The court's ability to second guess the Union's determination of its own goals is a matter I will leave to others to explain.

of a larger antitrust conspiracy of participants in the business market, the Court denied the exemption.

Whatever the rationale, *Allen Bradley* cannot be explained by saying that since conspiracies to restrain trade are not within the language of section 20 (whereas a conspiracy to engage in a concerted refusal to deal is), the conduct never was entitled to an exemption; for not only may the union be liable for the conspiracy itself (under such a rationale, conduct not covered by the exemption), but conduct which is described by section 20 in the very terms of the statute, ceases to be exempt under such circumstances. The *Allen Bradley* case thus leads to the remarkable result that *"the same labor union activities* may or may not be in violation of the Sherman Act, dependent upon whether the union acts alone or in combination with business groups." 325 U.S. at 810, 65 S.Ct. at 1540 (emphasis added). That is to say, the very acts which Congress permitted as an exception to conduct which it otherwise prohibited, could nevertheless fall within the statute's prohibition. Moreover, such liability will be premised on standards not found in the statutory exemption. The immunity afforded by the Clayton and Norris-La Guardia Acts is said to be "forfeited" in such a case. *See H.A. Artists,* 451 U.S. at 715, 101 S.Ct. at 2109. (*see* n. 23, *supra* ).

Despite the remarkable result, it is crucial to further analysis to recognize that the court found no constitutional or other impediment to Congress either regulating or exempting from regulation the conduct in question. Thus, in deciding questions concerning the labor exemption, Congress' language which exempts, boycotts no matter whom the union "persuades" (i.e. business groups or not) must be given the ordinary meaning of the words employed. *See Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983) (*quoting Richards v. United States,* 369

U.S. 1, 9, 82 S.Ct. 585, 590, 7 L.Ed.2d 492 (1962)). Certainly the word "persuasion" contemplates successful persuasion, *See* n. 31, *infra,* and thus in some sense an "agreement." It is crucial to the continued vitality of the words used in the Clayton Act's labor exemption that *Allen Bradley* be carefully read and understood. It is important to keep in mind that the *Allen Bradley* Court perceived itself as struggling to accommodate two apparently competing values. *See* 325 U.S. at 806, 65 S.Ct. at 1538. One value was the encouragement of competition in business markets, as expressed by the Sherman Act; the other was the elimination of competition in wages and working conditions in the labor market, as expressed by the Clayton and Norris-La Guardia Acts.[27]

As best this court can tell, the accommodation reached was this: as a general proposition, concerted activity in restraint of competition in a business market generally violates the Sherman Act. This rule applies to otherwise exempt union conduct if the union has combined with participants in the business market to restrain competition in that market. However, the union's conduct is entitled to the statutory exemption—even when it combines with participants in the business market—if the only restraint on competition in the market is the elimination or moderation of competition based upon industry differences in wages and working conditions where the conduct arises out of a labor dispute, and is described by the statute.

## C. *The Facts* [28]

### 1. *Undisputed Facts*

Foothills Express was a trucking company which employed non-union employees. A major portion of its business was in the sale of interlining services to the defendant unionized trucking companies. That is to say, the defendant trucking companies' union drivers would pick up a shipment of

---

**27.** Exactly why the court had to reconcile these competing values, in light of Congress having exempted labor activity from the purview of the Sherman Act (and thus itself having reconciled

the competing values) is as unclear to me as other matters in this field.

**28.** *See* n. 15, *supra.*

goods for ultimate delivery to a point in the foothills region of Northern California. Rather than deliver the goods the entire route, the originators would deliver them instead to a Sacramento depot, from which point Foothills Express' non-union drivers would ultimately deliver the goods to the consignee.

At some point, the Union began an attempt to organize the workers of Foothills Express. At first, it went directly to Foothills Express, in an attempt to obtain a Collective Bargaining Agreement. Foothills refused to sign. It claimed that it could not afford to pay union wages or benefits to its employees. The Union then offered a "sweetheart" contract to Foothills whereby the company could continue to pay the same "substandard" wages to its workers, but would be required to increase their benefits. Foothills still refused to sign any agreement. At some point, the Union decided to "stop [explicative deleted] around" with Foothills, and determined to force Foothills to sign a contract. The Union threatened Foothills that if it failed to sign an agreement, the Union would get Foothills' interlining customers to cease their interlining business with Foothills. The Union threatened that unless the plaintiff agreed to sign the contract, it would drive the plaintiff out of business. In spite of this pressure, the plaintiff still refused to sign a contract with the Union.

### 2. The Union's Facts

The foregoing facts are without substantial dispute. The evidence submitted by both the Union and the plaintiff corroborate them. I now turn to the uncontested facts proffered by the Union in order to determine whether it has met its initial burden of establishing the absence of a genuine issue as to any material fact, namely, the existence of a conspiracy, and that it is entitled to judgment as a matter of law.

The Union's evidence establishes that its officials began to receive complaints from its laid-off members concerning the practice of interlining with non-union carriers.

Those members, and the Union itself, came to believe that by interlining with Foothills Express and other non-union carriers, the defendant trucking companies were giving away jobs which "should" have gone to Union members. They became convinced that this practice was resulting in the layoffs of Union members. Following this discovery, the Union sought initially to convince Foothills to organize. When direct negotiation failed, it turned to other methods. Thus, according to the Union's evidence, the Union persuaded the trucking company defendants to cease doing business with Foothills Express so long as Foothills refused to sign a contract with the Union.

Before its activities relative to the other defendants actually began, the Union threatened to "get" the union trucking companies to boycott Foothills. The Union began its activities against Delta by filing a grievance with the California Valley Joint Committee claiming that the interlining arrangement with non-union carriers was causing its members to lose jobs. According to the Union's evidence, the Union threatened to picket at Di Salvo's gate (in conjunction with ambulatory picketing of Foothills) if non-union trucks were present at its terminal. The Union's evidence is that Nielsen ceased doing business with Foothills because of Union pressure. Also, the Union informed Peters that it was taking action against non-union carriers.

### D. Application of the Law to the Facts

As I now explain, the evidence just summarized constitutes significant probative evidence that by the plain language of the Clayton & Norris-LaGuardia Acts, the Union's conduct is exempt from Sherman Act liability.

### 1. Case Arising out of a Labor Dispute

The evidence establishes that the Union's conduct arose out of a "labor dispute." According to the Union's evidence, this case involves conflicting interests in a "labor dispute" and the defendants are "per-

sons interested" in the dispute. First, the Union was engaged in a labor dispute with Foothills Express in that it was attempting to organize Foothills' workers. This is a dispute over the "association or representation of persons in negotiating ... terms or conditions of employment," and therefore a labor dispute within the meaning of the Norris-La Guardia Act. *Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Products, Inc.*, 311 U.S. 91, 99–100, 61 S.Ct. 122, 126–127, 85 L.Ed. 63 (1940).[29] The Union's evidence establishes that there were conflicting interests in this labor dispute—the Union wanted to organize the workers, Foothills resisted the organizing drive.

Second, the Union's evidence establishes that all who participated in the conduct which is the subject of plaintiff's complaint were "persons participating in or interested" in the labor dispute. *See* 29 U.S.C. § 113(b). Relief herein is sought against the Union and the trucking company defendants. Each has a direct or indirect interest in the labor dispute between the Union and Foothills. The Union plainly has an interest in the dispute, as it seeks to organize Foothills' workers. *Milk Wagon Drivers' Union*, 311 U.S. at 93–94, 61 S.Ct. at 123–124,[30] and, as I explain below, although it may not be as obvious, the trucking company defendants are also "persons interested" in the labor dispute between the Union and Foothills.

The evidence proffered by both parties establish that the trucking company defendants interlined with Foothills because such activity gave them a competitive advantage: it was cheaper for the defendants to interline to Foothills, a non-union carrier, than to complete the delivery themselves, or to interline with a union carrier. If the

Union had been successful in organizing Foothills' workers, that part of the trucking companies' competitive advantage which derived from the difference between wages and benefits of workers in the industry would have been eliminated, or at least moderated. *Cf. Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 623, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975). The trucking companies would therefore have less of an incentive to interline with Foothills if the Union succeeded in its organizing drive. Thus from the organized workers' point of view, the competitive advantage of Foothills' employees, gained by virtue of their non-union status, would be either eliminated or moderated. Since the elimination of competition based upon the differences in wages and working conditions is precisely what the labor exemption is all about, *see United Mine Workers v. Pennington*, 381 U.S. 657, 664, 85 S.Ct. 1585, 1590, 14 L.Ed.2d 626 (1965), I must find that the trucking company defendants are persons interested in this labor dispute.

Indeed, in a sense, if the Union's dispute with Foothills is viewed in a broader prospective, there is but one single dispute between the Union and the trucking companies (whether plaintiff or defendant) concerning the allocation of jobs delivering goods in the foothills area. While it may be true that the Union contract contemplated that originators could interline with anyone, it is also true that they were free to complete delivery themselves. In this sense the labor dispute with Foothills transmuted into a dispute between the Union and the originators as to whether the trucking company defendants' employees were losing work which they could other-

---

**29.** The union in *Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Products, Inc.*, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940) sought to organize certain milk "vendors." Eventually, the vendors organized into a rival union. The Court held that this did not take the dispute out of the Norris-La Guardia Act, but that the dispute was simply transformed into a dispute concerning which of two rival unions would represent the workers. Such a controversy, the Court held, was a dispute arising out

of the representation of workers within the terms of the Norris-La Guardia Act. *Id.* at 99–100, 61 S.Ct. at 126–127.

**30.** I do not mean to imply that this direct an interest is necessary in order to be a "person ... interested." *See, e.g., New Negro Alliance v. Sanitary Grocery Co.*, 303 U.S. 552, 560–61, 58 S.Ct. 703, 706–07, 82 L.Ed. 1012 (1938).

wise expect to do but for their status as Union members. Put another way, the dispute with Foothills was an aspect of a dispute with the originators about contracting out—a dispute in which the trucking company defendants were directly involved.

There is no evidence that anyone other than the Union and the trucking company defendants participated in any of the conduct of which the plaintiff complains. Therefore, the Union has not combined with a stranger to this labor dispute. *See Hutcheson*, 312 U.S. at 233, 61 S.Ct. at 466 ("outsiders to the immediate dispute"). There is also no evidence (nor an assertion) that the Union's conduct was not in its own self-interest, and it appears obvious that it was. Finally, Foothills, the only other person involved in this conduct, is plainly a "person interested" in the dispute in that the Union sought to organize its workers.

### 2. *Conduct Within Section 20*

The Union's evidence establishes that the conduct complained of is within the "boycott" language of section 20 of the Clayton Act, 29 U.S.C. § 52. According to the Union's evidence, it peacefully and lawfully (if forcefully) persuaded the trucking company defendants not to deal with Foothills Express. Foothills was plainly a party to the labor dispute in that the Union sought to organize Foothills' workers. This conduct is specifically described and exempted by section 20. *Hutcheson*, 312 U.S. at 233, 61 S.Ct. at 466.

The consequence of the above analysis is to conclude that the Union has proffered significant probative evidence of both statutory requirements, and thus it has met its initial burden on the summary judgment motion.

### E. *The Plaintiff's Facts*

Once the defendant has met its initial burden, the burden of production shifts to the plaintiff. To avoid summary judgment, the plaintiff must come forward with "some significant probative evidence tending to support [its] complaint." *Compton v. Ide*, 732 F.2d 1429, 1434 (9th Cir.1984).

In order to establish that the union is not entitled to the statutory exemption, the plaintiff must establish that the conduct complained of does not arise out of a labor dispute, that the conduct complained of is not within the language of section 20, or that the conduct is "excepted" from the general protection of the exemption.

Here, the plaintiff seeks to meet its burden by proffering evidence that the Union "combined" with "non-labor" groups (the trucking companies) in a conspiracy to exclude plaintiff from the market, and to restrain and monopolize trade, by engaging in a group boycott, conduct it says is excepted from the general labor exemption. *See Allen Bradley*. I now turn to the plaintiff's evidence to determine if it has met its burden of production.

For the most part the plaintiff's evidence corroborates the union's. According to the plaintiff's evidence, the Local's Secretary/Treasurer, Mr. Bonilla, complained that his members were being laid off as a result of the unionized carriers' practice of interlining with non-union carriers. According to Bonilla, the unionized carriers would transfer their freight to non-union carriers mid-shipment, making less work for Teamsters members. Eventually, the Union became "tired of [explicative deleted] around" with the plaintiff, and determined that "unless plaintiff signed the sweetheart contract the Teamsters would drive plaintiff out of business." (Plaintiff's Opp., *citing* Dep. of J. Miller, March 4, 1983). The threats continued: "unless plaintiff signed the sweetheart contract ... the Teamsters would contact union motor carriers, cause those carriers to 'cut off,' and drive plaintiff out of business." (*Id., citing* Dep. of J.A. Miller, March 7, 1983).

The plaintiff's evidence goes on to detail the coercion exerted by the Union. The Union filed a grievance against defendant Delta on the basis of Delta's practice of interlining with a non-union carrier. It threatened Delta that it " 'had better not' tender any interline freight to non-union carriers, particularly Foothills Express ... unless the carriers 'wanted a lot more

grievances and problems.'" (*Id.*, *citing* Decl. of E.S. "Stan" Wycoff, May 21, 1982). Plaintiff's evidence shows that Delta was genuinely worried about the possibility of ambulatory picketing by the Union. Delta sought advice from the California Trucking Association on how to handle the possibility. (*Id.*, *citing* Dep. of Gordon Kirby, April 4, 1983). According to the plaintiff's evidence, when Delta did cease business relations with the plaintiff, it was at least in part because of the Union's pressure. (*Id.*, *citing* Dep. of J. Miller, March 3, 1983). According to plaintiff's evidence, Delta's terminal manager considered Foothills Express to be a " 'hot potato' " because of the Union pressure, and decided to switch to another line. (*Id.*).

The evidence concerning the Di Salvo termination is similar. The Union threatened to engage in ambulatory picketing of Di Salvo if it continued to interline with non-union firms. It also threatened to picket Di Salvo's Sacramento terminal. (*Id.*, *citing* Dep. of Bonilla (March 14, 1983)). Di Salvo had every reason to believe the threat was meaningful since, according to the plaintiff's evidence, the Union had engaged in such tactics in 1976. Plaintiff's evidence establishes that at least one reason Di Salvo ceased doing business with the plaintiff was the Union's pressure. (*Id.*, *citing* Dep. of J. Miller, July 20, 1982).

The evidence concerning Nielsen and Peters is less detailed. In the former case, Nielsen's president testified that the Union wanted his company to " 'cut off' " Foothills Express. (*Id.*, *citing* Dep. of J. Miller, July 20, 1983). As to Peters, the Union informed that company that it intended to take some action against the non-union carriers. The Union admitted that it was going to " 'put pressure' " on the unionized carriers to cease doing business with Foothills. (*Id.*).

According to the plaintiff's evidence, after the defendants had ceased doing business with plaintiff, the Union contacted Foothills to see if it was " 'feeling any of the pressure of the union.' " (*Id.*, *citing* Dep. of J. Miller, July 20, 1982). The Un-

ion informed Foothills that it should " 'smarten up and sign a contract or he [Teamsters business agent Jack Vallee] would see that they put [Foothills] out of business.' " (*Id.*).

In sum, then, the plaintiff's evidence is corroborative of the Union's evidence that it first attempted to organize Foothills' workers. When that effort failed, plaintiff's own evidence establishes that the Union persuaded the other defendants to boycott Foothills.

Notwithstanding that its evidence corroborates the Union's, the plaintiff asserts that the Union is not entitled to invoke the labor exemption provided by the Clayton Act and the Norris-La Guardia Act. Plaintiff asserts that its evidence establishes at least a triable issue of fact as to whether the plaintiff acted in concert with "non-labor" groups to restrain trade and monopolize the market. According to the plaintiff, it has presented circumstantial evidence of a conspiracy among the Union and the trucking company defendants to restrain trade by eliminating the plaintiff from the market. Plaintiff's contention is unsupportable. There is no direct evidence of such an agreement between or among anyone, nor is the circumstantial evidence sufficient to infer one.

### 1. Concerted Action Among Trucking Companies

The circumstantial evidence of conspiracy among the defendant trucking companies takes the form of "conscious parallelism." This evidence is insufficient to draw an inference of conspiracy against anyone. The theory of conscious parallelism is discussed elsewhere in this order (*see* § VII, *infra*). Suffice it to say that, under this theory, consciously parallel behavior is admissible circumstantial evidence of an underlying agreement. *See Standard Oil Co. v. Moore*, 251 F.2d 188, 210 (9th Cir. 1957), *cert. denied*, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958). The defendant rebuts any inference of conspiracy from conscious parallelism, however, by proffering significant probative evidence of

a good faith business reason for its action. *See Zoslaw*, 693 F.2d at 884.

In this case both the defendant and the plaintiff have effectively rebutted any such inference by proffering irrebutted evidence of a good faith business reason for the boycott—the union pressure itself. It is undisputed that that pressure was exerted individually against each trucking company, and that each company responded in the same way, namely by giving in to the pressure. Any inference that the trucking company defendants acted in concert, therefore, is effectively rebutted by the evidence proffered by both parties.

### 2. *Concerted Union/Trucking Co. Action*

The only possible concerted action remaining is concert between the Union and each trucking company. According to the plaintiff, the Union threatened that it would get the trucking companies to boycott Foothills Express, it exerted pressure upon them to do so, and eventually the trucking company defendants did boycott Foothills. Apparently, it asserts that at least as to the Union and each trucking company, this is sufficient evidence of conspiracy.

As an abstract contention, the plaintiff's assertion might be well taken. Circumstantial evidence of conformity to an agreed pattern of conduct may support an inference of conspiracy. *See, e.g., Filco v. Amana Refrigeration, Inc.*, 709 F.2d 1257, 1266 (9th Cir.) (vertical price fixing), *cert. denied*, — U.S. —, 104 S.Ct. 385, 78 L.Ed.2d 331 (1983); *Esco Corp. v. United States*, 340 F.2d 1000, 1008 (9th Cir.1965) (*citing United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948)). In *Filco*, for example,

the Ninth Circuit observed: "Filco's next theory is that Amana independently coerced Filco into adhering to a price schedule and that Filco acquiesced. If Filco could prove this, a conspiracy would be established." 709 F.2d at 1266. In this case, however, coercion of the trucking company defendants into boycotting Foothills Express is specifically exempted conduct. 29 U.S.C. § 52. The acquiescence of the trucking company defendants is also specifically contemplated. *Id.*[31] As I have noted, *supra*, where two reasonable inferences may be drawn, the court must draw the inference in favor of the party opposing summary judgment. Thus the question is whether the conduct proven, all of which is specifically exempted by the Clayton Act, may give rise to an inference of an unlawful conspiracy. I conclude that it may not.

Under the standards applicable to a defendant's motions for summary judgment in antitrust cases, the defendant may proffer evidence that it had a legitimate business reason for its conduct. This the plaintiff itself has done by proffering evidence that the trucking company defendants boycotted Foothills because of the Union's pressure. (*See* § VI(E), *supra*). Now, the plaintiff seeks to rely upon the very evidence which disproves conspiracy in order to prove it. Plaintiff has simply failed to meet its burden. Once the conspiracy allegations have been rebutted by " 'significant probative evidence showing alternative, legitimate business reasons for the defendant's conduct,' " as here, the burden of production shifts to the plaintiff "to advanc[e] *additional* specific evidence of such a conspiracy." *Landmark Development Corp. v. Chambers Corp.*, 752 F.2d 369 (9th Cir.1985) (per curiam) (emphasis added) (*quoting Program Engineering,*

---

**31.** As I noted above, "persuasion" implies, as a matter of ordinary English usage, not only an attempt to convince, but at least the possibility of a successful one. "Where Congress has not specifically defined a term '[t]his silence compels us to start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.' " *Russello v. United States*, 464 U.S. 16, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983) (*quoting Richards v. United*

*States*, 369 U.S. 1, 9, 82 S.Ct. 585, 590, 7 L.Ed.2d 492 (1962)). Given the legislative history of the labor exemption, it cannot be doubted that concerted activity by union members (i.e. strikes and picketing) was one means Congress had in mind when granting unions exemption from the antitrust laws when persuading others not to deal with an employer with whom the union was engaged in a labor dispute.

Inc. v. Triangle Publications, Inc., 634 F.2d 1188, 1195 (9th Cir.1980)).

Rather than advancing additional evidence of a conspiracy, the plaintiff only asks the court to view the evidence in a different light. I conclude that the light the plaintiff would throw on the evidence is insufficient to give rise to an inference of an unlawful antitrust conspiracy. There is no logical inference of *antitrust* conspiracy which may be drawn from labor conduct indisputably [32] designed to coerce the trucking company to organize its workers—conduct which is specifically exempt from Sherman Act liability by section 20 of the Clayton Act. To permit such conduct to give rise to an inference of other, unlawful, conduct under the very statute from which the conduct is exempted is not only illogical, but it would quite effectively write the exemption out of the Clayton Act. In the absence of any other, additional, evidence that the Union conspired with the trucking company defendants to restrain trade in the relevant markets, the evidence proffered is insufficient as direct or circumstantial evidence of such a conspiracy.

Because there is no direct evidence to support plaintiff's position, the question is solely one of inference. "An inference ... is a deduction of one fact from another proven fact by the ordinary rules of logic and reason." *Constar, Inc. v. Plumbers Local 447*, 568 F.Supp. 1440, 1445 (E.D.Cal. 1983) (*citing* 1 J. Weinstein & J. Berger, *Weinstein's Evidence* ¶ 300[01] at 300–2 (1982)), *aff'd*, 748 F.2d 520 (1984). Thus, to draw an inference two conditions must exist; first a proven fact, second, a logical deduction from that fact, drawn pursuant to ordinary rules of logic and reason.

One example should suffice to illuminate the rule: a trier of fact may (but need not) draw an inference that where a party fails to call a witness available to him, that witness' testimony would be adverse, but no such inference may be drawn when the witness is equally available to both parties.

*Kean v. Commissioner*, 469 F.2d 1183, 1187 (9th Cir.1972) (*quoting*, McCormick, Evidence § 249, p. 534 (1954)). On analysis, then, if it be proven that a witness was within the control of a particular party only, then a fact has been proven which as a matter of logical deduction gives rise to the inference that failure to call the witness may be because that witness' testimony would harm the party. Of course, that inference is merely permissive, but on summary judgment the court must draw it on behalf of the opposing party. Where, however, there was no evidence that the witness was within the power of the party, then drawing the inference is impermissible because the factual predicate has not been laid and thus on summary judgment the court could not draw the inference, even though on summary judgment it is obligated to draw all reasonable inferences in favor of the opposing party. On the other hand, if the witness was available to both parties it would equally be improper to draw the inference, not because the factual predicate had not been proven, but because when the witness is available to both parties it violates the rules of logic and reason to do so. *See Kean*, 469 F.2d at 1187.

As I now explain, in the present case the facts simply do not permit the drawing of an inference that the Union's activities were outside the labor exemption, both because there is no factual predicate upon which to draw the inference, and because it is illogical. As I have noted above, the only proven facts are those consistent with activity within the labor exemption. All of the evidence shows unilateral coercion by the Union of the trucking company defendants solely for Union purposes. In the absence of any evidence of a combination with those defendants (and a lack of any evidence of an antitrust purpose rather than a labor purpose), the factual predicate upon which an inference can be drawn simply does not exist.

---

**32.** The plaintiff indicates in its briefs that the Union had some other design. Yet not a shred of evidence puts this issue in dispute. The Union's evidence remains uncontradicted that its purpose and design was to organize Foothills' workers.

Moreover, even with the existence of evidence of a combination, such an inference, under the uncontested facts, is also impermissible. As an example, the Union's threat to drive the plaintiff out of business has been demonstrated by unrebutted evidence to be solely rhetoric, based upon its attempt to force Foothills to unionize. Thus, after it had succeeded in coercing the trucking defendants to cease doing business, the Union's agents called plaintiff to see if it was "feeling the heat," and was prepared to sign an agreement. The plaintiff's own evidence demonstrates that the purpose of the phone call was to ascertain whether Foothills was prepared to cry "uncle;" under the circumstances, had Foothills agreed to unionize, the pressure would have ended. Under these proven predicate facts, to draw an inference of a restraint of trade combination violates common sense, the very gravamen of the ordinary rules of logic and reason. Of course, had plaintiff presented any evidence of a combination rather than unilateral coercion, or an antitrust conspiracy which the Union could be inferred to have joined, the inference would be proper. Without such proof of predicate facts, however, the Union's motion must be granted.

### 3. Case Law

Although I believe my conclusion above is necessitated by the evidentiary rules governing summary judgment, they must also be consistent with law. The court wishes to candidly admit that there is remarkably broad language in some of the cases that have addressed the issues considered here. Nonetheless, my conclusion is consistent with the authoritative interpretations of the labor exemption of which this court is aware. In every case before the Supreme Court or Ninth Circuit involving a boycott (primary or secondary) of a party to a labor dispute, in the absence of a larger conspiracy in restraint of trade, the party instigating the boycott has been entitled to the labor exemption. *See New Negro Alliance v. Sanitary Grocery Co.*, 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938); *Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Products, Inc.*, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940); *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941); *Bodine Produce, Inc. v. United Farm Workers Organizing Committee*, 494 F.2d 541 (9th Cir.1974). Put another way, the only cases which have condemned primary or secondary boycotts in an antitrust context and refused to apply the labor exemption, have been those in which, upon analysis, either a labor dispute did not exist, or a larger antitrust conspiracy existed. *See Allen Bradley Co. v. Local Union No. 3*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); [33] *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975).[34]

---

**33.** The Supreme Court has since stated that the *Pennington* case had nothing to do with the labor exemption. *See H.A. Artists & Associates, Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 716 n. 18, 101 S.Ct. 2102, 2109 n. 18, 68 L.Ed.2d 558 (1981). I do not know what to make of this, but note that even if the case had been related to the labor exemption (*see* 381 U.S. at 661–663, 85 S.Ct. at 1588–1589), the exemption was denied because of the union's participation in a larger antitrust conspiracy.

**34.** In *Connell*, the union exacted an agreement to restrain trade from a participant in the business market with whom it had no labor dispute. This case may extend the *Allen Bradley* rule a bit in that there was no pre-existing conspiracy which the union simply joined. Nonetheless, once the agreement was exacted, it was a conspiracy in the business market in restraint of trade, and unrelated to competitive advantages gained from differences in wages and working conditions. In sum, *Connell* dealt with an agreement with a business organization with which the union had no collective bargaining agreement and did not seek one, the object of which was to prevent the contractor from dealing with other businesses that the union did not have collective bargaining agreements with and with whom the union had no labor dispute. Indeed, the substance of the union's agreement with Connell was such that it was a disincentive for the union to organize the unorganized employees in the subcontracting market. If the agreement had stood, the work would go to those subcontractors already organized and thus the union could ignore the unorganized subcontractors. In the case at bar, of course, the

### 4. Conclusion

The evidence before the court establishes that the Union engaged in activities protected by section 20 of the Clayton Act. Reading that evidence in the light most favorable to the plaintiff, but avoiding impermissible and illogical inferences (*see* § VI(E)(2), *supra*), I find no significant probative evidence that the Union joined any trucking company conspiracy to eliminate the plaintiff from the market in restraint of trade, nor that it originated such a conspiracy on its own. The evidence establishes that the Union sought only two legitimate labor union goals. First, it attempted to organize plaintiff's workers. When that effort failed, the Union attempted to prevent the loss of jobs suffered by its members by unilateral conduct which caused the remaining defendants to boycott the plaintiff until it signed a contract with the Union. There is no evidence that the Union ever abandoned its goal of organizing Foothills' workers, or protecting its members' jobs. Its efforts to eliminate only that portion of Foothills' competitive advantage which derived from the "substandard" wages and benefits Foothills paid its drivers is a goal protected by the labor laws, the Clayton Act and the Norris-La Guardia Act. The Sherman Act may not be used to frustrate such union goals.

The Union's motion for summary judgment is therefore GRANTED.

## VIII

## THE TRUCKING COMPANY DEFENDANTS' MOTIONS

### A. The Applicable Law

In order to prevail in this antitrust action, the plaintiff must prove, at a minimum, the existence of a conspiracy. A "conspiracy" in this context, is "[1] a joint undertaking [2] having an unlawful purpose, [3] arising out of agreement...." *Standard Oil Co. v. Moore*, 251 F.2d 188, 196 n. 3 (9th Cir.1957) (after trial) (*citing United States v. Kissel*, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168 (1910)), *cert. denied*, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958). The remaining (trucking company) defendants move for summary judgment on the basis that no evidence exists to show a joint undertaking arising out of agreement. According to those defendants, they each refused to deal with the plaintiff not as the result of an agreement with any of its co-defendants, but as the result of its own independent action taken pursuant to sensible business judgment.

### B. Application of the Law to the Facts
#### 1. Joint Action Arising Out Of Agreement

According to the evidence of Di Salvo and Peters the decision of each to refuse to deal with the plaintiff was the result of unilateral action by itself alone.[35] The evidence pointed out by Nielsen, while it fails explicitly to deny the existence of a conspiracy, establishes that Nielsen acted unilaterally, and not pursuant to any conspiracy. It is undisputed that each of these defendants refused to deal with the plaintiff *at least in part*[36] as a consequence of the plaintiff's back solicitation as against each of them. Unless a unilateral refusal to deal in response to back solicitation of one's customers is sufficient to predicate antitrust liability against the defendants, the burden of production shifts to the plaintiff to establish that the refusals to deal

---

Union sought to organize Foothills, and its labor dispute with Foothills, if viewed broadly, was an aspect of its dispute with the originators about contracting out. To say that the facts of this case are distinguishable from *Connell* is to state a modest proposition indeed.

**35.** For Peters, *see* Affidavit of Walter F. Peters, President, June 20, 1983 ("Peters") at ¶¶ 10 and 11; Affidavit of Theodore Peters, Vice President, June 20, 1983 ("T. Peters") at ¶ 8. For Di Salvo, *see* Affidavit of Fowler, Terminal Manager, June

20, 1983 ("Fowler"), at ¶¶ 16, 17, 20, 24, 25; Affidavit of Di Salvo, President, June 20, 1983 ("Di Salvo") at ¶¶ 8–10.

**36.** The defendants claim the back solicitation was one of many reasons. The plaintiff claims it was one of only two reasons, the other being pressure by the Union. The court is satisfied that as to all the other reasons proffered *by the defendants* (poor delivery record, bad credit, and so on), a triable issue of fact exists as to whether they actually existed or not.

were in fact concerted action taken pursuant to an agreement.

### a. Refusal to Deal Because of Back Solicitation

■ Plaintiff may be arguing that even in the absence of agreement between the defendants, a refusal to deal in response to plaintiff's back solicitation of their customers states a claim under the antitrust laws. If so, the plaintiff is in error. The defendants may each individually refuse to deal with whomever they choose so long as "'the refusal "is for business reasons which are sufficient to the [defendant] in the absence of any agreement restraining trade."'" *Zoslaw,* 693 F.2d at 889 (*quoting Chandler Supply Co. v. GAF Corp.,* 650 F.2d 983, 989 (9th Cir.1980)).

In this case, it is undisputed that the business reason for the refusal to tender interlining traffic was Foothills' practice of using that interlining relationship to acquire the defendants' customers for itself. Both Foothills and the trucking company defendants freely concede this. The appropriateness of the business decision not to do business with an interliner which engages in back solicitation (quite apart from its legality) is also undisputed. The defendants engaged in the practice of interlining solely for self-interested economic motives, in that it was cheaper to interline to Foothills than to carry the entire load themselves. The relationship allowed them to offer a trucking service to customers even when it would otherwise be uneconomical for them to do so. Interlining with a company which used the interlining relationship to "steal" the customer is obviously contrary to the economic goals sought to be achieved by interlining in the first place.

Foothills makes an argument that it was contrary to at least Di Salvo's best economic interests to switch to another carrier because it received a lower percentage of the interlining revenues from Foothills' competitors than it did from Foothills. The argument is preposterous. If, as is undisputed, Foothills uses the interlining relationship to hijack Di Salvo's customers, that relationship gives Di Salvo a higher revenue percentage of nothing.

Plaintiff's only hope of avoiding the motions for summary judgment, then, is to establish the existence of a genuine dispute as to whether the defendants' refusal to deal was concerted action arising out of an agreement among them.

### b. Direct Evidence of Conspiracy

■ Plaintiff first claims that the defendants have failed to deny the existence of a conspiracy. The plaintiff is in error. Di Salvo and Peters have expressly done so (see n. 33. *supra*), and a similar denial is a necessary inference from Nielsen's deposition testimony. Plaintiff's sole direct evidence of a conspiracy is defendants' deposition testimony referring to a "rule" against back-solicitation. Plaintiff's tortured interpretation of that testimony is entitled to no weight. That evidence establishes only that every trucking company regarded the practice of back solicitation with disfavor. Under the plaintiff's best reading of that evidence, as to each trucking company, proof that Foothills (or any interliner) had back solicited its customers was reason to terminate the interlining relationship. Nothing in that testimony indicates that any trucking company conspired with anyone else to institute such a policy, or to enforce any such rule.

As I have explained above, inferences are not drawn out of thin air, but from evidence. Plaintiff has proffered no direct evidence from which the existence of conspiracy could be drawn.

### c. Circumstantial Evidence of Conspiracy

Examining all of plaintiff's papers, the court is able to discern two types of circumstantial evidence upon which the plaintiff might seek to predicate the inference of conspiracy. Each of them is insufficient on its own; and considered together, they are still insufficient.

#### (i) Conscious Parallelism

■ The plaintiff argues, in the part of its brief dealing with the alleged Union conspiracy, that the defendants' simultaneous refusals to deal with the plaintiff constitute circumstantial evidence of con-

spiracy. "Consciously parallel business behavior in matters touching prices and competition does not itself constitute a Sherman Act offense." *Standard Oil*, 251 F.2d at 210. Nor is it sufficient, standing alone, to create an inference of conspiracy. *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 84–85 (9th Cir.1969) (*citing First Nat'l Bank*, 391 U.S. at 286–88, 88 S.Ct. at 1591–92), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

> It is, however, admissible circumstantial evidence of an underlying agreement, combination, or conspiracy concerning such matters. The probative value of such evidence is to be determined by the trier of the facts.

*Standard Oil*, 251 F.2d at 210–11 (*citing Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540–41, 74 S.Ct. 257, 259–60, 98 L.Ed. 273 (1954)). Even assuming the plaintiffs have established that the actions taken by the defendants were similar, taken at the same time, and with knowledge that the others were taking similar action (although I do not find on any of these issues), the plaintiff has failed to make out a case of consciously parallel action.

The Ninth Circuit requires "that the plaintiff demonstrate that the allegedly parallel acts were against each conspirator's self interest, that is, that the decision to act was not based on a good faith business judgment." *Zoslaw*, 693 F.2d at 884.[37] As adverted to above, this has not been, and cannot be demonstrated by the plaintiff. Even ignoring all the other evidence tending to establish good business reasons for the defendants' conduct, it is undisputed that back solicitation defeats the economic incentive to engage in interlining in the first place. It injures the originating carrier's business by depriving it of customers. The same would be true if (as the defendants' evidence tends to show) the interliner repeatedly destroyed the shippers' goods.[38]

In addition, the Ninth Circuit requires some showing of a "plausible motivation" for the conspirators' conduct. As noted above, the only plausible motivation for the defendants' conduct creates a nearly inescapable inference of individual, not concerted action. The parallel action theory is of no aid to the plaintiff.

#### (ii) *Industry Meetings*

■ Plaintiff appears to suggest that information changed hands between competitors in the trucking industry and that from this fact an inference of prohibited conspiracy may be drawn. The argument is unpersuasive. Even if the trucking companies exchanged information about who was back soliciting whom (and there is not a shred of evidence to this effect), standing alone, the exchange of this kind of information among competitors, in the absence of evidence of agreement or consent to an illegal arrangement, is insufficient to prove a conspiracy. *Zoslaw*, 693 F.2d at 885 (*citing Maple Flooring Manufacturer's Ass'n v. United States*, 268 U.S. 563, 575, 45 S.Ct. 578, 582, 69 L.Ed. 1093 (1925)). *Cf. id.* at 885–86 (exchange of credit information among competitors so that each can decide for itself whom to extend credit to not a violation of Sherman Act) (*citing Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648 n. 12, 100 S.Ct. 1925, 1928 n. 12, 64 L.Ed.2d 580 (1980)).

### C. *The Union "Enlistment" Boycott*

The plaintiff offers evidence tending to show that the Union persuaded the defendants to boycott Foothills. Even if this showing were sufficient, standing alone it is insufficient for the reasons set out in the Union's motion for summary judgment.

---

**37.** Obviously, the good faith business judgment cannot be that it is in the conspirators' best interest to violate the Sherman Act.

**38.** No reasonable person could think that it requires a conspiracy before an originating carrier will stop tendering freight to a company which consistently destroys that freight. Even if it were an "industry rule" that, say, ten such incidents would suffice to terminate the relationship, and each trucking company defendant terminated the plaintiff after losing ten shipments each, there is no evidence of concerted action. This is evidence only that the defendants behave rationally and similarly to identical stimuli.

(*See* § VI, *supra* ). The plaintiff's evidence shows no more than conduct protected by section 20 of the Clayton Act, and fails to establish concerted action with others. It is therefore not subject to liability under the Sherman Act, even though engaged in by other than a labor organization. *See New Negro Alliance*, 303 U.S. 552, 58 S.Ct. 703. The "parallel action" evidence is insufficient to show concerted action in the absence of any other evidence of conspiracy. *See, e.g., Independent Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656, 661 (9th Cir.) (after trial) (*citing Theatre Enterprises*, 346 U.S. at 540–41, 74 S.Ct. at 259–60, *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963)). In the absence of other evidence, defendants are correct in asserting that plaintiff's inability to establish motive or economic detriment is fatal to the parallel action theory. *See, e.g., Zoslaw*, 693 F.2d at 884–85. The economic detriment to defendants from the practice of back solicitation is undisputed in the record. It is difficult to understand how plaintiff could even argue that defendants' loss of their own customers does not adversely affect them.

### D. *Conclusion*

The defendants have each met their initial burdens on summary judgment by establishing the absence of a conspiracy, and that their actions were independent actions pursuant to sensible business judgment. The plaintiff has failed to meet its burden by proffering significant probative evidence (direct or circumstantial) either of the existence of a conspiracy, or that the defendants acted pursuant to the conspiracy. The motions of all defendants for summary judgment are hereby GRANTED.

## IX

## THE REMAINING MOTIONS

### A. *Defendants' Remaining Motions*

Defendants move for summary judgment on the remainder of plaintiff's complaint on the basis that the two pendent state claims are completely dependent upon the existence of a Sherman Act violation. The complaint reveals that both the Cartwright Act claim and the Interference With Advantageous Economic Relations claim are predicated upon a Sherman Act violation. The motions to dismiss these claims are therefore GRANTED as to all defendants.

### B. *Plaintiff's Remaining Motions*

The plaintiff moves for summary judgment on the issue of liability for the "back solicitation conspiracy," the statute of limitations affirmative defense (Delta and Nielsen),[39] as well as the "Unclean Hands" affirmative defense (Di Salvo).[40] The court declines to rule on any of these motions as they are now MOOT.

## X

## CONCLUSION

Defendants' motions for summary judgment are hereby GRANTED. Plaintiff's motion for summary judgment or partial summary judgment relative to the "back solicitation" conspiracy is DENIED.

The complaint and underlying action is DISMISSED as to all defendants. Plaintiff's remaining motions are MOOT.

IT IS SO ORDERED.

---

**39.** Nielsen did not oppose the motion.

**40.** Di Salvo filed a Statement of No Opposition to the motion.