**BLIZZARD ENTERTAINMENT INC.**

**v.**

**CEILING FAN SOFTWARE LLC et al.**

**Case No. SACV 12–00144 JVS(RNBx).**

United States District Court,
C.D. California.

Signed Sept. 23, 2013.

Daniel A. Kohler, Elaine K. Kim, Jean P. Nogues, Karin G. Pagnanelli, Marc Ellis Mayer, Mitchell Silberberg and Knupp LLP, Los Angeles, CA, for Blizzard Entertainment Inc.

Christopher W. Arledge, Peter R. Afrasiabi, One LLP, Newport Beach, CA, Lance C. Venable, Venable Campillo Logan & Meaney PC, Phoenix, AZ, for Ceiling Fan Software LLC et al.

Order Granting Plaintiff's Motion for Summary Judgment and Denying Defendants' Motion for Summary Judgment Plaintiff's Tort Claims in 1st Amended Complaint (F'ld 7–23–12)

JAMES V. SELNA, District Judge.

**The Court, having been informed by the parties that they submit on the**

Court's tentative ruling, previously issued, hereby GRANTS the Plaintiff's Motion for Summary Judgment and DENIES the Defendants' Motion for Summary Judgment and rules in accordance with the tentative ruling as follows:

This action arises out of Defendants' marketing of software programs designed to run in conjunction with Plaintiff's online computer role-playing game. Presently before the Court are two Motions for Summary Judgment, including a Motion for Summary Judgment as to liability only filed by Plaintiff Blizzard Entertainment, Inc. ("Blizzard") (Docket No. 82), and one filed by Defendants Ceiling Fan Software, LLC ("CF"), Brian Becker ("Becker"), and Stanton Fraser ("Fraser") as to all claims (Docket No. 87). Timely Opposition and Reply Briefs have been filed, as have multiple volumes of evidence in support of and in opposition to the present Motions. (Docket Nos. 117, 122, 131 & 136.)

Blizzard moves for summary judgment as to liability on all legal claims.[1]

Blizzard seeks summary judgment regarding Defendants' liability on a claim that Defendants knowingly and tortiously induced Blizzard's game players to breach their a term of their contracts with Blizzard that prohibits the use of the type of software programs sold by Defendants. Blizzard also seeks summary judgment on a related claim asserted pursuant to California Unfair Competition Law ("UCL"). Finally, Blizzard seeks summary judgment that the individual Defendants, who were also Blizzard's game players in their own right, breached their contracts with Blizzard that expressly prohibited the use of the software programs.

For their part, Defendants not only contend that Blizzard's Motion for Partial Summary Judgment should be denied, but that they should be awarded summary judgment in their favor as to all claims.

As set forth below, the Court grants Blizzard's Motion for Partial Summary Judgment and denies Defendants' Motion for Summary Judgment.

## I. *Uncontroverted Facts*

The material evidence is uncontroverted. Despite a number of evidentiary objections on both sides, resolution of the present Motions for Summary Judgment does not require consideration of inadmissible evidence.[2]

### A. *Blizzard's World of Warcraft Software*

Blizzard developed and sells its popular online role-playing game "World of Warcraft." (Rice Decl. ¶ 2.) WoW is a "massively multiplayer online role-playing game," which is a type of game in which players from around the world collectively participate and play in a vast virtual world populated by monsters, creatures, and a variety of characters created by Blizzard. (*Id.*) WoW gameplay encompasses an expansive range of activities, from fighting

---

**1.** In its Notice of Motion, Blizzard states that it moves for a finding of liability as to its first cause of action for intentional interference with contractual relations, its second cause of action for breach of contract, and its fourth cause of action for unfair competition in violation of California Business & Professions Code § 17200 et seq. ("UCL"). Blizzard's third cause of action is captioned "unjust enrichment," which is not itself a separate legal claim. *See Melchior v. New Line Prod.,*

*Inc.,* 106 Cal.App.4th 779, 793, 131 Cal. Rptr.2d 347 (2003). And although it is not precisely a remedy either, the Court agrees this issue is more amenable to resolution in a damages phase.

**2.** The Court declines to set forth a detailed ruling on every objection raised by the parties, particularly those not material to the Court's rulings.

monsters, to gathering materials and crafting usable items. (*Id.* ¶ 3.) Players install the software, create an account, and connect to an on-line server maintained by Blizzard to play along with thousands of other players. (*Id.* ¶¶ 6–8.)

Blizzard expends considerable monetary resources and employs many people, including artists, programmers, sound designers, and computer engineers. (*Id.* ¶¶ 7–8.) For example, it spends hundreds of thousands of dollars each month to update the game, maintain its computer servers, and provide ongoing customer support. (*Id.* ¶ 8.) Blizzard charges its users a monthly subscription fee. (*Id.* ¶ 9.) Blizzard devotes many resources to testing the game and refining its gameplay to ensure that the game (and its reward system) is fair, balanced and provides equal challenges to all players. (*Id.* ¶¶ 10–11.)

In order to play WoW,[3] a user must agree to two separate contracts, the "World of Warcraft End User License Agreement" ("EULA") and the "Terms of Use" ("ToU"). (*Id.* ¶ 28.) Both the EULA and the ToU prohibit players from using "cheats, automation software (bots), hacks, mods, or any other unauthorized third-party software designed to modify the World of Warcraft experience."[4] (*Id.* ¶ 29.)

### B. Defendants' "Botting" Software

Defendants Becker and Fraser jointly own (and are the sole owners of) the corporate Defendant, Ceiling Fan LLC, an Ohio Limited Liability Company formed in 2011. (Becker Depo. at 11–12; Mayer Decl. Ex. 4) Defendants are in the business of selling and distributing two pieces of computer software—Pocket Gnome and Shadow Bot (collectively, the "Bots"), which are software "bots" that, when installed on a player's computer, permit the player to "automate" his or her WoW game play on Apple Mac computers and Windows PCs, respectively.[5] (Becker Depo. at 47.) Defendant Becker is the lead developer and programmer of Pocket Gnome and Shadow Bot. (Becker Depo. at 50 & 64.)

These Bots are designed to engage in repetitive and elongated play of WoW for the player while he or she is away from the computer or engaged in other activities. (Rice Decl. ¶¶ 22–23.) Players who purchase the Bots can use them to exploit WoW's reward system by collecting virtual currency, items, and experience without actually playing the game, including for periods of time impossible for human players (for example, through the night or for hundreds of hours without interruption). (*Id.*) In game play, a player's use of bots allows him or her to gain an artificial advantage over players who don't use bots but who devote the same actual game play time. (*Id.*)

Pocket Gnome and Shadow Bot are single-purpose software products in that they

---

**3.** In a procedure that has become familiar to the vast majority of internet users, installation of WoW software requires assent to the EULA and ToU via a dialog box that conditions installation of the software upon the user's mouse click indicating acceptance of the software provider's terms. (*See* Rice Decl. ¶¶ 28–31.) Access to game play requires such assent. (*Id.* ¶ 31.)

**4.** Various versions of the EULA and the ToU have been used, but all versions used since at least October 2007 have contained this prohibition. (Rice Decl. Ex. 2.)

**5.** In addition to the Bots, Defendants also offer for sale an "enhancement" to Pocket Gnome, called "Pocket Goblin," which is a collection of software "hacks" or "cheats" that allow players to engage in activities normally restricted by the game, such as flying, walking through walls, or moving faster. (Becker Depo. at 148–54.)

are designed to operate only with WoW, and cannot be used with any other computer game. (Becker Depo. at 111; Fraser Depo. at 88.)

### C. *Sale and Management of Defendants' Software Licensing*

Defendants promote and sell the Bots on dedicated websites located at www. pocketgno.me and www.shadowbot.net, accessible through Defendants' website at www.ceilingfansoftware.com. (*See* Mayer Decl. Exs. 9 & 51.) Defendants sell access to their Bots for a one-time start-up fee of $25.00, a monthly license fee of $8.99, and an additional $2.99 license fee for Pocket Goblin.[6] The monthly subscription fee is a recurring charge to the user's credit card and must be manually cancelled through the third-party website PayPal.

Defendants offer extensive instruction on how to effectively use the Bots within WoW, including videos, instruction manuals, and FAQs on their websites. (Becker Depo. at 145–46; Mayer Decl. Exs. 12, 16 & 47.)

Defendants have approximately 800–900 outstanding licenses for Pocket Gnome and 900–1000 outstanding licenses for Shadow Bot, and at any given time, there are 100–120 of Defendants' Bots running in WoW.[7] (Becker Depo. at 203.) As of early 2013, Defendants received in excess of $289,000 in revenue in connection with the Bots. (Fraser Depo. at 159–60.)

Defendants have purchased the term WoW as a Google keyword, so that searches for "WoW" will generate links to Ceiling Fan's website. Defendants further embed their website with metatags for "WoW," "World of Warcraft Bot," and "farming." (Becker Depo. at 35.) Defendants have purchased banner ads on websites dedicated to cheating in WoW, such as Ownedcore.com, a website self-described as providing "World of Warcraft Exploits, Hacks, Bots and Guides." (Becker Depo. at 51:5–16; Fraser Depo. at 126–27 & 130–31.)

At all times since they began operating their business, Defendants have known that the WoW ToU and EULA prohibited users from using bot software, including Shadow Bot and Pocket Gnome. (Becker Depo. at 46, 94 & 172–74; Fraser Depo. at 42.) For the past several years, the front page of Defendants' Pocket Gnome website contained the following statement:

> Is Pocket Gnome a violation of the Terms of Service (ToS)? Yes. Pocket Gnome is absolutely against the ToS. There aren't enough superlatives in the English language to fully convey how against the rules this is. If you get caught, you will probably be banned. So be smart and don't get caught.

(Mayer Decl. Ex. 11.) Now, the disclaimer reads:

> We recognize that Blizzard Entertainment is opposed to the use of bot programs and does not authorize them in the TOS/EULA. . . . By using our software, it is possible that Blizzard could

---

**6.** The specifics of the pricing structure are not fully supported by the evidence cited, which consists of deposition testimony and PayPal records; however, in their Statement of Disputed Facts, Defendants expressly agree these facts are uncontroverted. (*Compare* Docket No. 86–1 ¶ 52) (setting forth pricing structure), *with* Docket No. 140 ¶ 30 (no objection to substance of Blizzard's ¶ 52).

**7.** The evidence cited does not establish that at any given time, there are 100–120 of Defendants' Bots running in WoW; however, Defendants agree these facts are uncontroverted. (*Compare* Docket No. 86–1 ¶ 54 (Blizzard's proffered fact), *with* Docket No. 140 ¶ 31 (Defendants concur with Blizzard's proffered fact except as to the use the term "exponentially").)

ban your account and cite the language of the TOS and EULA as the reason for the ban.

(Mayer Decl. Ex. 20 (third page).)

Defendants have also advised their customers:

> Pocket Gnome is a bot. This means that there is some risk that you will be banned. If you get banned, do not try to convince others to stop using Pocket Gnome and do not claim that Pocket Gnome was detected by Blizzard unless you have strong evidence. Your ban or a few temporary bans co-occurring are by no means evidence that Blizzard is on our tail. If the Pocket Gnome community or development team is under the impression that Pocket Gnome is detected, or if it becomes unsafe to use Pocket Gnome, we will issue an official statement.

(Mayer Decl. Ex. 13.)

Defendants publicly claim that they have designed their Bots to be "undetectable" by Blizzard in that the Bots do not inject themselves into a computer's memory and they cannot be detected using standard technical means (such as memory scanning). (Becker Depo. at 69–70, 169–71 & 197; Fraser Depo. at 72–73.) Defendants advise their customers about how to avoid detection by Blizzard or other players. (Becker Depo. at 74 & 122; Fraser Depo. at 120–26 & 128.)

Defendants employ "moderators," whose job is to review the message boards, offer helpful advice, and delete disruptive posts or users. (Becker Depo. at 119–20.) Defendants do not delete posts by their users concerning ways to avoid detection of use of the Bots by Blizzard. (*Id.* at 122.) Defendants permit their customers to post messages on their forum concerning the purchase and sale of characters, accounts, and virtual goods. (*Id.* at 54–55.)

Defendants have the ability to monitor which of their users are actively using the Bots at any given time. (Fraser Depo. at 66.) Nevertheless, they do not make any effort to ensure that their Bots are being used in a manner that does not harm the game or disrupt other players. (Becker Depo. at 217; Fraser Depo. at 66–67.)

Moreover, Defendants do not restrict who may purchase their bots or how they may use them. (Becker Depo. at 97–99 & 217.) While Defendants reserve the right to terminate their user's licenses, they have never terminated a user for any misuse of the Bots other than sharing licenses with non-licensees. (Becker Depo. at 99; Fraser Depo. at 59–61 & 66–67.)

### D. *Blizzard's Enforcement Efforts*

Blizzard devotes considerable resources to policing WoW game play for use of bots, hacks, or other cheats, including use of software, human analysis of data reflecting automated characters, and investigation of customer complaints. (Rice Decl. ¶¶ 34–37; *see generally* Kenney Decl. *passim.*)

Blizzard allows game players to report suspected cheating. (*Id.* ¶¶ 3–4.) In the past two years, 185,000 complaints related to botting were received, and over 91,000 were written complaints that specifically mentioned "botting." (*Id.* ¶¶ 5–6.) Investigation of these complaints cost in excess of $390,000. (*Id.* ¶ 6.)

When use of a bot by a game player is discovered, the player's account is revoked or suspended (generally for 48 or 72 hours). (Rice Decl. ¶ 32.)

Approximately 1,4000 Ceiling Fan customers have received bans, suspensions, or warnings from Blizzard as a result of their botting activities.[8]

---

8. Defendants purport to dispute this fact, but the evidence cited does not dispute the Rice

### E. *Individual Defendants' Game Play*

Both of the individual defendants have played WoW and created WoW accounts. (Becker Depo. at 22–23; Fraser Depo. at 24–25 & 35–36.) Both of the individual defendants assented to the EULA and ToU when they created their WoW accounts. (Becker Depo. at 44–45; Fraser Depo. at 25–27; Rice Decl. ¶ 30.) Specifically, Becker and Fraser have used the online aliases "Tanaris4" and "Jokur," respectively. (Becker Depo. at 14; Fraser Depo. at 11.) Defendants Becker and Fraser both have engaged in botting in WoW. (Becker Depo. at 56, 59 & 62; Fraser Depo. at 32–35.)

As early as 2009, Becker and Fraser knew that botting was prohibited and could result in a loss of their accounts under the terms of the EULA and the ToU. (Becker Depo. at 67–68, 71 & 101; Fraser Depo. at 29, 37 & 41–42.) Accounts registered using the individual Defendants' email addresses have been repeatedly suspended and/or banned for botting and other Terms of Service violations. (Rice Decl. ¶ 41 & Ex. 7.)

Fraser has also purchased between 12 and 13 pre-played WoW accounts from others, paying approximately $2,000 in total for them. (Fraser Depo. at 33 & 146.)

## II. *Summary Judgment Standard*

Summary judgment is appropriate only where the record, read in the light most favorable to the nonmoving party, indicates that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *see also Celo-*tex Corp. v. Catrett, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary adjudication, or partial summary judgment "upon all or any part of a claim," is appropriate where there is no genuine issue of material fact as to that portion of the claim. Fed.R.Civ.P. 56(a), (b); *see also Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 769 n. 3 (9th Cir.1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim. . . .") (internal quotation marks omitted).

Material facts are those necessary to the proof or defense of a claim, and are determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks and citations omitted). In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable

Declaration on this topic. (*See* Defs.' Statement of Disputed Facts ¶ 11 (citing Rice Depo. at 63–65).) Because the Bots are specifically designed to be difficult to detect, Rice compared the email addresses used to purchase the Bots with email addresses used to set up WoW accounts. (Rice Decl. ¶ 42.) In doing so, he found that emails used to purchased the Bots were associated with over 1,400 disciplinary actions by WoW for botting and related activity. (*Id.* & Ex. 8.)

inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898, 902 (9th Cir.1987).

The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If the moving party meets its burden, then the nonmoving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. *See id.* at 322–23, 106 S.Ct. 2548. If the nonmoving party meets this burden, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.,* 210 F.3d 1099, 1103 (9th Cir.2000).

Where the parties have made cross-motions for summary judgment, as the parties have here, the Court must consider each motion on its own merits. *Fair Hous. Council v. Riverside Two,* 249 F.3d 1132, 1136 (9th Cir.2001). The Court will consider each party's evidentiary showing, regardless of which motion the evidence was tendered under. *See id.* at 1137.

### III. *Tortious Interference with Contractual Relations*

■ In California, "[t]he elements ... for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach of disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship;

and (5) resulting damage." *Quelimane Co. v. Stewart Title Guar. Co.,* 19 Cal.4th 26, 55, 77 Cal.Rptr.2d 709, 960 P.2d 513 (1998) (internal quotation marks and citation omitted). The third element incorporates a causation requirement that these intentional acts were a substantial factor in causing the breach. *See Bank of New York v. Fremont Gen. Corp.,* 523 F.3d 902, 909 (9th Cir.2008) (applying California law).

■ Unlike the related tort of intentional interference with prospective economic advantage (which is not asserted here), intentional interference with contractual relations does not require that a defendant's conduct be independently wrongful. *Quelimane Co.,* 19 Cal.4th at 55, 77 Cal. Rptr.2d 709, 960 P.2d 513 ("Because interference with an existing contract receives greater solicitude than does interference with prospective economic advantage, it is not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself.")

■ On the uncontroverted evidence, Blizzard has established all five elements of tortious interference with contractual relations, and as a result, it is entitled to summary judgment as to Defendants' liability on this claim.

It is undisputed that all WoW game players must enter into the EULA and ToU before playing. Thus, all WoW game players, including those who also use Defendants' Bots to play, have a valid existing contract with Blizzard. Thus, the first element is met.

Likewise, the second element is met because it is undisputed that Defendants knew of those contracts, including the term prohibiting the use of bots.[9]

9. The Court disagrees that certain evidence regarding Defendants' knowledge somehow absolves Defendants of liability. (*See* Defs.' Motion at 4–5.) Specifically, Defendants ar-

Notwithstanding the existence of those contracts, and Defendants' knowledge thereof, Defendants engaged in a number of intentional acts that were designed to induce Wow game players' breach of the bot prohibition. Indeed, the uncontroverted evidence establishes that the botting software has no other purpose than to engage in game play that is expressly prohibited by the EULA and ToU. Defendants' intentional actions include not only the design and sale of the botting software, but includes a number of other continuing actions,[10] including the continued licensing for use of the botting software after payment of a monthly subscription fee, taking steps to ensure the botting software is appropriate for use in the most current version of WoW, educating their customers regarding how best to use the Bots and avoid detection of such use, and continuing maintenance of and making commentary on an on-line message board.

As a result, the uncontroverted evidence establishes the third element, including the requirement that Defendants' actions be a substantial factor in causing the breach.

The uncontroverted evidence establishes multiple breaches of the bot prohibition by WoW game players using Defendants' botting software, and therefore, the fourth element has been established as well.

The uncontroverted evidence also establishes resulting harm. Blizzard is expends hundreds of thousands of dollars combating the use of software bots, including Defendants' Bots, to ensure fair game play.[11] It is also undisputed that tens of thousands of other game players lodge complaints against cheating players. Such complaints reflect dissatisfaction with those users' game playing experience and, by extension, reflect harm to WoW's and Blizzard's good will and reputation.

 In any event, to the extent that the exact quantification of Blizzard's damages attributable to Defendants' Bots is not precisely ascertainable, Defendants cannot be heard to complain. The uncontroverted evidence establishes that Defendants' botting software was designed to avoid detection of its use. California law has long recognized that "[o]ne whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could not be measured with exactness." *Zinn v. Ex–*

gue that they expressly warn their customers that use of the software violates the terms of the EULA and ToU; thus, the responsibility for any breach belongs solely to their users. However, this warning does not have the effect of transferring the Defendants' legal responsibility for Defendants' actions to their users. Instead, this evidence establishes Defendants' knowledge of the probability that their users will breach the EULA and ToU; thus, establishing the second element of Blizzard's tortious interference claim.

**10.** These actions are continuing in nature; thus, the Court rejects Defendants' "timing" argument that points to an absence of evidence regarding the possible lack of an existing contract between Blizzard and a botting software purchaser at the time the botting software is purchased from Defendants. (*See*

Defs.' Motion at 2–3.) Thus, because Defendants continue to support their customers' WoW game play using the Bots long after purchase, the timing argument is unpersuasive. Moreover, even if this were not the case, the uncontroverted evidence establishes that WoW game players purchase month-to-month licenses of the botting software; thus, eventually the existence of a WoW account will eventually precede the monthly renewal of a botting software license in the vast majority of the time.

**11.** The Court disagrees with Defendants' contention that these expenditures "are not damages, but are mere prophylactic measures [Blizzard] has chosen to take to address its perceived problem." (Defs.' Motion at 2.) By analogy, repairing a hole in a dam may be prophylactic, but it also has a cost.

*Cell–O Corp.*, 24 Cal.2d 290, 297–98, 149 P.2d 177 (1944).

## IV. UCL

■ The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. An act can be alleged to violate any or all of the three prongs of the UCL—unlawful, unfair, or fraudulent. Plaintiff contends Defendants actions are unlawful and unfair.

■ The UCL prohibits "unlawful" practices that are forbidden by any law. *Saunders v. Superior Court*, 27 Cal. App.4th 832, 838, 33 Cal.Rptr.2d 438 (Ct. App.1994). The statute "borrows" violations of other laws and treats them as actionable. *Cel–Tech Commc'ns v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). A claim under the UCL unlawful prong may be premised upon the unlawful actions that constitute tortious interference with contractual relations. *See, e.g., CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1107 (9th Cir.2007).

■ Because the uncontroverted facts establish tortious interference with contractual relations, and because Defendants' actions in designing, licensing, and supporting its botting software can fairly be said to constitute a "business act or practice," the uncontroverted facts likewise establish a UCL violation.

■ Summary judgment in favor of Blizzard is therefore granted as to its UCL claim under the "unlawful" prong.[12]

## V. Breach of Contract

■ In California, "[a] cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811, 821, 124 Cal.Rptr.3d 256, 250 P.3d 1115 (2011).

■ Here, the uncontroverted facts establish all elements of the breach of contract action, which is asserted against the individual Defendants only. Specifically, Defendants Becker and Fraser were WoW game players who assented to the EULA and ToU with the bot prohibition. Blizzard maintained its servers and permitted Becker and Fraser to play WoW, thus performing under the contract. Becker and Fraser admitted to using the Bots in their game play, which constitutes a breach of the parties' contracts.

In the same manner that the uncontroverted evidence establishes resulting harm for tortious interference, it also establishes resulting harm for Defendant Becker's and

---

**12.** Blizzard also contends that it is entitled to summary judgment on its UCL claim under the "unfair" prong. An "unfair" business practice consists of "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel–Tech Commc'ns*, 20 Cal.4th at 187, 83 Cal.Rptr.2d 548, 973 P.2d 527. "[A]n 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *People v. Casa Blanca Convalescent Homes*, 159 Cal.App.3d 509, 530, 206 Cal. Rptr. 164 (1984). Blizzard does not separately articulate why the unfair prong applies to Defendants' conduct. Therefore, and because summary judgment under the unlawful prong authorizes the remedies available under the UCL, the Court does not consider whether summary judgment in Blizzard's favor is warranted under the unfair prong of the UCL claim.

Fraser's breach of contract, although admittedly on a smaller scale. It is uncontroverted that Blizzard expends hundreds of thousands of dollars combating the use of software bots, and the individual Defendants' use of the Bots contribute to those increased costs. Moreover, the collective damage to Wow's and Blizzard's good will and reputation amounts to measurable harm, and the Defendants' actions contribute to this harm. Additionally, the individual Defendants game play using the Bots is not just as a personal hobby or past time, it is also product testing that facilitates broader surreptitious use of the Bots by Defendants' customers, who number almost 2,000. (*See* Becker Depo. at 231–32; Fraser Depo. at 37.) In essence, they are honing the unlawful interference which they are promoting.

Thus, the uncontroverted evidence establishes all elements of Blizzard's breach of contract claim against the individual Defendants.

## VI. *Permanent Injunction*

Blizzard contends it is entitled to a permanent injunction. It also suggests an additional full round of briefing on the issue. Although the Court agrees that Blizzard is entitled to a permanent injunction essentially banning continued sale, licensing, and use of the Bots, because of the extensive factual and legal record already before the Court, the Court does not find that additional evidence or legal briefing on the issue is necessary.

 Specifically, in addition to considering Blizzard's success on the merits,[13] the Court has considered whether Blizzard has met its burden to establish that (1) it has suffered an irreparable injury; (2)

remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be dis-served by a permanent injunction. *eBay, Inc. v. MercExchange, LLC,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). The Court's "decision to grant or deny permanent injunctive relief is an act of equitable discretion." *Id.*

 Here, these factors are met. The first two factors are met because, as noted above, the complaints lodged by tens of thousands of WoW game players regarding the use of bots reflect customer dissatisfaction and resulting loss of goodwill and harm to Blizzard's reputation. *See, e.g., SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.,* 846 F.Supp.2d 1063, 1083 (N.D.Cal.2012) (loss of goodwill or lack of ability to control reputation constitutes irreparable harm); *Stark v. Diageo Chateau & Estate Wines Co.,* 907 F.Supp.2d 1042, 1066 (N.D.Cal.2012) (same).

 The balance of equities and the public interest factors likewise favor a permanent injunction. The record reflects that the harm to Defendants resulting from the issuance of an injunction will be considerable, perhaps resulting in the dismantling their entire business. However, the record also reflects that Defendants' business was built entirely upon the very intentional interference with Blizzard's contracts that the present claims seek to redress. Thus, the equities weigh strongly in favor of the issuance of an injunction. Finally, the public interest is served by parties' performing as promised under

---

**13.** Because the Court has granted summary judgment in favor of Blizzard, Blizzard has not only a likelihood of success on the merits but also actual success on the merits of its claims.

their contracts rather than seeking out surreptitious methods to commit difficult-to-detect breaches of those contracts.

Thus, because issuance of a permanent injunction is warranted on these factors, within seven days of the entry of this Order, Blizzard shall file and email its proposed permanent injunction. Defendants' objections to the terms proposed by Blizzard, and Defendants' proposal for the amount of a bond (if any), must be filed no later than fourteen days after the entry of this Order. Blizzard may file a response of no more than five pages no later than twenty-one days of the entry of this Order. Thereafter, as it deems appropriate, the Court will issue a permanent injunction, order additional briefing, and/or set the matter for further hearing.

## VII. *Conclusion*

As set forth herein, the Court grants Blizzard's Motion for Partial Summary Judgment, and denies Defendants' Motion for Summary Judgment.

Summary judgment as to liability only is granted in favor of Blizzard as to the first, second, and fourth causes of action.

**IT IS SO ORDERED.**